IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| JULIE J., | ) | |
| Plaintiff, | ) | Civil Action No. 5:23-cv-00007 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY, | ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Julie J. asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1385. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that the Commissioner's final decision is supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

1

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th

Cir. 2017); 20 C.F.R. § 416.920(a)(4).[1] The claimant bears the burden of proof through step four.

*Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is

not disabled. *See id.*

## II. Procedural History

This is Julie's second time applying for disability benefits. *See* Administrative Record

("R.") 99. In March 2014, she filed for SSI alleging disability based on various physical and

mental impairments. *See* R. 81, 84. An ALJ denied that claim after a hearing in July 2017. *See* R.

81–91, 99.

Julie filed this SSI claim on January 13, 2020. R. 250. She alleged that she became

disabled on January 1, 1998, *id.*, because of degenerative disc disease; CREST and white matter

disease; "appenment [sic] of spinal cord"; bipolar disorder; and personality disorder, R. 244. She

was thirty-nine years old in January 2020, *see* R. 250, making her a "younger person" under the

regulations, 20 C.F.R. § 416.963(c). Virginia Disability Determination Services ("DDS"), the

state agency, denied Julie's claim initially on October 6, 2020, R. 97–112, and upon

reconsideration on June 24, 2021, R. 114–21. On February 3, 2022, Julie appeared with counsel

and testified by telephone at an administrative hearing before ALJ Melissa Hammock. *See* R.

46–76. A vocational expert ("VE") also testified at the hearing. R. 46, 72–75.

ALJ Hammock issued an unfavorable decision on April 1, 2022. R. 10–27. At step one,

she found that Julie had not engaged in substantial gainful activity since January 13, 2020. R. 13.

At step two, the ALJ found that Julie had "severe" medically determinable impairments

("MDIs") of "degenerative disc disease of the cervical and lumbar spine; obesity; asthma;

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the Commissioner's final written decision.

bipolar disorder; CREST syndrome; Raynaud's syndrome; scleroderma; and bilateral carpal

tunnel syndrome." *Id.* At step three, the ALJ found that Julie's severe MDIs did not meet or

medically equal the relevant Listings. *See* R. 14–16 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§

1.15, 12.04, 12.06, 14.04). As part of this analysis, she found that Julie had no limitation

understanding, remembering, or applying information and "moderate" limitations interacting

with others, concentrating, persisting, or maintaining pace, and adapting or managing herself. R.

15–16. The ALJ based her limitation ratings in the first three categories on objective medical

evidence. *See id.* Her "moderate" rating in the fourth category was based on Julie's reported

activities and the objective medical evidence. R. 16.

Next, ALJ Hammock found that Julie had the residual functional capacity ("RFC") to do

"sedentary" work[2] with additional restrictions that she

> can only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and
> stairs; never climb ladders, ropes, or scaffolds; have no exposure to unprotected
> heights or moving mechanical parts; [must] avoid concentrated exposure to
> temperature extremes and pulmonary irritants; [can] frequently handle and finger
> bilaterally; can have frequent interaction with supervisors and co-workers;
> occasional superficial interaction with the public; adapt to occasional changes in
> the work routine; and she can perform simple and routine tasks.

R. 17. At step four, the ALJ found that Julie had no past relevant work. R. 25. Based on the VE's

testimony, the ALJ found that a hypothetical worker with this RFC and Julie's vocational profile

could perform certain unskilled sedentary occupations (document preparer, final assembler, and

lens inserter) that offered a significant number of jobs in the national economy. R. 25–26 (citing

---

[2] Sedentary work is the least physically demanding level of exertional work in the regulations. *See* 20
C.F.R. § 416.967(a)–(e). "Sedentary work involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." *Id.* § 416.967(a). A
person who meets those lifting and carrying requirements can perform a full range of sedentary work if
she can also stand and walk for up to two hours and sit for about six hours in an eight-hour workday. *See*
*Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984); *see also Hancock v. Barnhart*, 206 F. Supp. 2d 757,
768 (W.D. Va. 2002). ALJ Hammock found that "the evidence [wa]s consistent with finding that [Julie]
[wa]s limited to sitting, standing, [and] walking . . . at the sedentary level of exertion." R. 20.

R. 73–74). Accordingly, the ALJ concluded that Julie was not disabled during the relevant

period. R. 26. The Appeals Council denied Julie's request to review the ALJ's decision, R. 1–3,

and this appeal followed.

## III. Discussion

Julie challenges the Commissioner's denial of benefits on two grounds. *See* Pl.'s Br. 12–

20, ECF No. 11. First, she argues that ALJ Hammock's mental RFC analysis is not supported by

substantial evidence because the ALJ improperly evaluated the opinion of Paul Hill, Psy.D. *Id.* at

12–18. Dr. Hill opined that Julie was mildly impaired in her "[a]bility to perform simple and/or

repetitive tasks"; moderately impaired in her abilities to "perform complex tasks," "perform

consistently," and "manage routine stressors"; and markedly impaired in her abilities to "attend

work regularly," "perform without interruptions from symptoms," and "interact with supervisors,

co-workers, and the public." R. 318. Second, Julie argues that the ALJ's adverse credibility

finding as to her alleged "inability to sit for prolonged periods of time" is not supported by

substantial evidence. Pl.'s Br. 18–20. Both objections are persuasive.

### A.    Summary

#### 1.    Treatment Records[3]

On November 19, 2013, Julie saw Paul Lyons, M.D., Ph.D., for "complaints of diffuse

neck, back, and limb pain." R. 1010–11. On examination, she had 2/4 deep tendon reflexes

throughout, intact sensation to light touch, and full power "at 5/5 throughout." R. 1010. Dr.

Lyons's clinical interpretation of results from motor nerve and sensory nerve conduction studies,

---

[3] Some of these records were created before Julie filed this SSI claim in January 2020. Nonetheless,
"ALJs should consider evidence that predates" the relevant period in order to fully understanding of the
claimant's medical condition. *Andrew V. v. Saul*, No. 5:18cv55, 2019 WL 4262505, at *4 (W.D. Va. Sept.
9, 2019). Here, ALJ Hammock expressly evaluated medical opinions dating back to February 2015. R. 24
(citing R. 318).

F-wave latencies, and EMG testing was that "[t]here [wa]s electrophysiological evidence" of

"[c]hronic mild bilateral L5 radiculopathies." R. 1011.

In 2013, a thoracic spine MRI showed "mild dextroconvex scoliosis centered in the lower

thoracic spine"; "straightening of the thoracic kyphosis"; "small degenerative osteophytes in the

lower thoracic spine"; and "mild disc desiccation." R. 1057. The impression was that Julie had

"mild scoliosis and straightening of the thoracic kyphosis," "multilevel mild degenerative

change," and "minimal spinal cord flattening at T4–5." *Id.* In 2014, a cervical spine MRI showed

"mild levoscoliosis," "reversal of the normal cervical lordosis," and "[c]ongenitally short

pedicles . . . with relative narrowing of the cervical canal." R. 1051. The impression was that

Julie had "[a]nnular fissures and right paracentral protrusions at C5–6 and C6–7 with cord

deformity and central canal narrowing at C5–6." *Id.* She also had "[m]oderate right foraminal

narrowing at C5–6" and "[u]ncovertebral joint hypertrophy causing very mild left foraminal

narrowing at C3–4." *Id.* A lumbar spine X-ray showed "mild levocurvature," "[m]ild

degenerative changes," and "chronic anterior height loss of T12." R. 1093. The impression was

that Julie had "mild multilevel degenerative disc disease," mild levoscoliosis, and "[c]hronic

appearing anterior height loss at T12." *Id.* An inner auditory canal and posterior fossa MRI

showed a "nonspecific" "solitary punctate area of high signal located within the deep parietal

white matter of both cerebral hemispheres." R. 1059. Findings were "otherwise normal." *Id.* On

a November 2019 brain MRI, findings were unchanged. R. 373–74. The radiologist "felt" that

the punctate area of high signal "represent[ed] either tiny areas of reactive gliosis or chronic

small vessel ischemic change." R. 374.

Julie underwent a consultative mental status evaluation with Dr. Hill on February 4,

2015. R. 316–19. She reported that she saw a counselor and a psychiatrist, but the medications

her psychiatrist prescribed did not "help if she was very stressed." R. 317. She denied psychosis and "current suicidal or homicidal ideation, intent, or plan." *Id.* She reported that "her recent mood ha[d] been 'angry and upset/crying'" and that she had "a history of trouble sleeping," neglected her hygiene "pretty frequently," and neglected household chores. R. 317–18. On examination, she appeared to be "adequately attentive," "of average range intellectual ability," and "reserved but cooperative." *Id.* She had typical posture. *Id.* She had typical eye contact; "logical, fluent, spontaneous[,] and reciprocal" speech; 3/3 immediate recall; intact "[o]bject naming, sentence repetition, three stage command, and basic reading and writing"; and 2/2 "[p]roverbs." *Id.* She appeared to be ungroomed and had to "fight back tears on a couple occasions." *Id.* She had "angry/depressed" mood; depressed affect; 2/3 delayed recall; and poor "[s]ymbol copy." *Id.* She "seemed to misunderstand" serial sevens, but she could "spell 'world' backward." *Id.* Dr. Hill diagnosed her with major depressive disorder, "[r]ecurrant, [m]oderate"; intermittent explosive disorder; and polysubstance dependence, "in [e]arly [r]emission by self-report." R. 318.

On December 2, 2015, Julie saw Mark Landrio, M.D, at Neurologic Associates. R. 1007–08. On examination, she was alert, appropriate, and "not dysmetric." R. 1007. She "arose and ambulated with a normal-based gait without ataxia." *Id.* She had normal reflexes and reduced sensation. *Id.* Dr. Landrio concluded that Julie had "lumbar degenerative disc disease with multilevel spinal stenosis, moderately severe at the L3–L4 root level and mild and chronic at the L4–L5 level with moderately severe left foraminal narrowing at L5–S1." R. 1008. He previously given Julie a Medrol Dosepak, "which [she] found to be significantly efficacious." R. 1007. Dr. Landrio noted that Julie had "paranoid bipolar disorder." R. 1008.

In 2016, a cervical spine X-ray showed "normal alignment to the cervical vertebral bodies," "moderate degenerative disc disease at C5–6," and "mild degenerative disc disease at C4–5." R. 407. A lumbar spine X-ray showed "sacralization of the inferior[-]most lumbar[-]type vertebral body," "similar-appearing physiologic anterior wedging at the thoracolumbar junction," and "[d]egenerative disc disease . . . at L2–L3 with small anterior osteophyte formation." R. 409. Findings were otherwise normal. *Id.*

Julie saw Anne Solomon, N.P., from March 2017 to December 2019, at Neurologic Associates. R. 424–25, 427–28, 430–31, 986–90, 1000–02. Julie reported leg cramps, backache, back pain, joint pain, joint stiffness, muscle cramps, muscle pain, muscle weakness, numbness, unusual sensation, and unsteadiness. *Id.* She also reported anxiety, mood changes, insomnia, and panic attacks. *Id.* On examination, she "ar[o]se[] and ambulate[d] in a normal based gait without ataxia." R. 428, 431, 989, 1001. She had 5/5 power throughout and reduced sensation. *Id.* Nurse Solomon occasionally gave Julie Medrol Dosepaks. R. 431, 989. In 2019, she ordered a lumbosacral spine MRI, "referred [Julie] to a new pain management physician," R. 431, and referred Julie to physical therapy. R. 428.

On May 3, 2018, Julie went to the emergency room for upper back pain "in between her shoulder blades" and shortness of breath. R. 324, 327. On examination, she had normal mood, affect, and behavior. R. 330. She had normal range of motion and no edema, tenderness, or distress. R. 330. Emergency room providers discharged Julie the same day. R. 327.

On August 5, Julie went to the emergency room for "burning" low back pain. R. 344–46. She reported that she had tingling, but no numbness, and was "able to find certain positions to get comfortable in." R. 346. On examination, she had normal range of motion, reflexes, muscle tone, and coordination. R. 347. She had no joint effusion, erythema, or midline tenderness to

palpation. *Id.* Later that day, an emergency room provider noted that Julie was "comfortable at th[at] time." R. 351. Emergency room providers diagnosed Julie with "[c]hronic left-sided low back pain with left-sided sciatica" and discharged her. R. 345.

Julie saw Candy Lamas Rodriguez, M.D., at Shenandoah Community Health, from November 2018 to October 2019. R. 483–86, 497–99, 506–12, 697–702. In November 2018, Julie reported back pain, anxiety, and depression. R. 510. On examination, she had inappropriate, depressed mood and affect, but she had no "pressured speech" or suicidal ideation. R. 511. She completed PHQ-9s, the results of which indicated "[s]evere depression." R. 497–99, 507. Dr. Rodriguez prescribed Zoloft, Lamictal, and ibuprofen. R. 511. On a later examination, Julie had appropriate mood and affect and normal insight and judgment. R. 486.

On January 29, 2019, Julie saw Stephen Maro, N.P., for "continuous[] throbbing, aching, shooting, stabbing, burning[,] and severe" lower back and left leg pain. R. 598. She reported that her pain was "10/10," and had been 6/10 on average. *Id.* She had "numbness, tingling, pins/needles[,] and burning." *Id.* Various factors and activities, including driving, aggravated the pain. *Id.* "[R]est, lying with pillow between legs, pain medication[,] and swimming" mitigated the pain. *Id.* On examination, she had good insight and judgment. R. 601. She had normal gait, posture, "[m]anual motor testing for lower extremities," sensation to light touch in lower extremities, and "muscle bulk/tone"; negative straight leg raise test; and no lumbar shift. R. 601–02. However, she had "palpatory tenderness along facet joint" and positive facet loading test and Patrick's maneuver. *Id.* Nurse Maro planned to give her a "left L4–L5 transforaminal epidural steroid injection with sedation," order a lumbar MRI, and refer her to "[l]umbar physical therapy." R. 602. He prescribed Valium and recommended that Julie "trial [h]eat[,] . . . rotat[ing] heat with ice," and "over-the-counter topicals." R. 602–03.

9

On March 25, Julie saw Waheed Baksh, M.D., D.P.T., for pain management. R. 614. She reported that she had "8/10" constant, moderate to severe, "[s]harp, [s]hooting, [d]eep, [and e]lectric[-]like" low back pain. *Id.* The pain radiated to her hips and buttocks "with intermittent numbness and tingling." *Id.* She reported that the left side was "worse down the left leg termina[]ting at foot." *Id.* She also had thoracic and neck pain. *Id.* She reported that sitting worsened her pain. *Id.* On examination, the range of motion in her lumbar spine on extension and left and right lateral flex was limited with pain. *Id.* Her bilateral posterior superior iliac spine and lumbar paraspinal muscles were tender to palpation. R. 615. Her straight leg raise test was positive "at 30 degrees on left." *Id.* Her lumbar facet challenge was negative, *id.*, and the range of motion in her hips was within normal limits, R. 614. She had "slowed" gait. R. 615. She had good judgment and insight, appropriate affect, and intact memory. R. 615. Dr. Baksh assessed her with lumbar radiculopathy, lumbosacral degenerative disc disease, low back pain, and lumbar and sacral osteoarthritis. *Id.* In April, he prescribed methylprednisolone. R. 617.

Julie continued to see Dr. Baksh and his physician assistant through February 2021. *See* R. 538, 619, 621, 625, 627, 629, 631, 633, 635, 637, 639, 645–47, 649–50, 652–54, 656–57, 659, 662. On examinations, her tone was normal, and her sensation was "[n]ormal in all dermatoms." *Id.* Her lumbar facet challenge was bilaterally "[p]ositive with reproduction of low back pain, non-radiating." *Id.* Examination findings were otherwise unchanged. *Id.* Dr. Baksh and his physician assistant prescribed gabapentin, R. 620, methylprednisolone, *id.*; R. 634, Percocet, R. 620, 622, 628, 632, and Norco, R. 539, 629, 632, 634, 636, 638, 640, 647, 650, 654, 657, 660, 663, 665. In July 2019, Dr. Baksh gave Julie a medial branch block with no complications. R. 623–24. Julie reported "100% relief for 1–2 days following the procedure," but "the relief faded away . . . . [and] her pain" returned and could "still be a[n] 8/10." R. 625. She later reported that

"[h]er medication work[ed] well with her pain symptoms." R. 627. However, her pain continued, R. 538, 629, 631, 633, 635, 637, 639, 645, 649, 652, 656, 659, 662, and sometimes worsened, R. 538, 629, 631, 633, 635, 639, 645, 649, 652, 656.

On August 22, 2019, Julie had a lumbar spine MRI. R. 370–71. It showed "congenital narrowing of the AP diameter of the pedicles at all levels," "disc degeneration involving the L3–L4 and L5–S1 discs," "moderate to severe disc space narrowing at the L5–S1 level," and "partial lumbarization of the S1 vertebral body." R. 371. The L3–L4 level had "mild spinal stenosis . . . secondary to focal central disc protrusion/herniation of the L3–L4 disc." *Id.* The L5–S1 level had progressive, "moderate to severe disc space narrowing"; "moderate degenerative change facets bilaterally"; and "mild bony foraminal narrowing on the left." *Id.* The L5–S1 disc had "[m]ild central and leftward bulging." *Id.* Findings were otherwise normal. *Id.* The impression was that Julie's lumbar spondylosis had mildly progressed. *Id.*

In October, Julie saw Caitlin Forgione, P.T., D.P.T., for physical therapy. R. 379–82, 386–87, 452–53. Julie had cervical spine pain, R. 379; *see also* R. 386, 452, that "occasionally radiate[d] into" the backs of her legs, "down to her great toe" on the right and "into the thigh" on the left, R. 379. Her "mid and low back '[we]re usually fine' unless she" did certain activities, including "rising from a seated position [and] sitting in the car." *Id.* The pain was 0/10 at best and 7/10 at worst. R. 380. On examination, sitting "initially help[ed]" the pain. *Id.* The pain worsened with the day's progression, "bending, rising, walking," and being "on the move," and her pain improved with laying and being still. *Id.* She had intact motor function at "5/5 or 4+/5" and intact sensation to light touch at L2–S2. R. 380–81. She did not tolerate "[g]eneral light touch to lumbar and thoracic spine." R. 381. The lumbar spine had no movement loss with flexion, minor loss in right and left side gliding with "increased pain on the right," and moderate

loss in extension. *Id.* The cervical spine had no movement loss with protrusion, minor loss with retraction, moderate loss with flexion and lateral flexion, and major loss with extension and bilateral rotation. R. 386. Her symptoms increased during and worsened after seated repeated retraction. *Id.* She had impairments related to "gait, pain, [and] poor body mechanics and posture." R. 381. She had "limitations in community activities" and "home management" and "performance in leisure activities," self-care activities of daily living, and work activities. *Id.* Despite "doing the exercises," Julie reported that she "didn't really see a difference." R. 452. Her "lumbar and thoracic spine continue[d] to have a large increase in pain with repeated spinal motions but decrease with maintaining one position[,] with the most decrease in pain occurring in spinal neutral." R. 453. On November 29, Ms. Forgione discharged Julie from physical therapy because she had "not reestablished contact with the clinic." R. 399.

Julie saw Hugh LaBree, F.N.P., at Shenandoah Community Health from January to August 2020. R. 478–82. On examination, she was anxious and had obsessive thoughts. R. 480. She had appropriate mood, affect, R. 471, 475, 480, 752, and behavior, R. 480; normal insight, judgment, R. 471, 475, 480, 752, attention span, and concentration, R. 480; and sufficient language and fund of knowledge, *id.* She had no agitation, anhedonia, compulsive behavior, euphoria, fearfulness, flight of ideas, forgetfulness, grandiosity, hallucinations, hopelessness, increased activity, memory loss, mood swings, paranoia, pressured speech, or suicidal ideation. *Id.* Her lumbar spine was moderately to severely tender "with paraspinal spasm," and she "was in distress with sit to stand from chair in room." R. 475.

Julie saw a psychiatrist, Charles Winfrey, M.D., from January 2020 to November 2021. R. 532, 533, 534, 590, 592, 969–73. His handwritten notes are largely illegible, *id.*, but he noted Julie "feeling edgy" in January 2020, R. 534, and having "anger outbursts" from June to

12

November 2021, *see* R. 969–72. On examination, Julie was alert, oriented, pleasant, and polite,

and she had normal appearance and behavior; cooperative attitude; normal, fluent, and coherent

speech; appropriate mood and affect; and linear, logical, and goal-directed thoughts. R. 532, 533,

534, 590, 592, 969–73. She had no suicidal or homicidal ideation, delusions, flight of ideas,

hallucinations, or "[l]ooseness of [a]ssociations." *Id.* Dr. Winfrey prescribed sertraline, Lamictal,

R. 532, 533, 534, 590, 592, 595, 969–73, Topamax, R. 532, 533, 534, 592, 595, and Risperdal,

R. 969–72.

On August 30, 2020, Julie had a consultative medical examination with Matthew Wilson,

M.D. R. 542–47. She reported that she had bipolar disorder and borderline personality disorder

and experienced "crying spells, changes of appetite, fatigue, mood swings, lack of motivation,

and difficulty sleeping and concentrating." R. 542. She did not have "suicidal thoughts or manic

episodes." *Id.* She reported that she had degenerative disc disease with symptoms of "occasional

numbness and tingling in her legs" and "constant, dull, achy, [and] occasionally sharp" pain in

her back and hips. *Id.* The pain was 4/10 that day, "but it [wa]s usually 10/10." *Id.* "Activity,

sitting, standing, and walking ma[d]e [her pain] worse while nothing help[ed] to relieve [it]." *Id.*

On examination, she had good eye contact and concentration, fluent speech, appropriate mood,

normal memory, and "clear thought processes." R. 545. She had normal muscle bulk and tone,

5/5 strength throughout, negative straight leg raise test, and she had no "palpable muscle

spasms," "joint swelling, erythema, effusion, . . . deformity," or edema. R. 544–45. She had

"mild tenderness to palpation of the neck, lower back[,] and bilateral hip." R. 545. She could

"squat and rise from that position with mild difficulty" and "rise from a sitting position without

assistance," and she "had no difficulty getting up and down from the exam table." *Id.* She could

not tandem walk, and she had "mild difficulty" walking on heels and toes. *Id.* The ranges of

motion in her cervical spine and thoraco-lumbar spine were normal. R. 546.

On June 17, 2021, Julie saw Erica Winslow, M.D. R. 736–43. On examination, Julie's

cervical spine and thoracic spine were normal and had normal ranges of motion. R. 741.

However, she had "[t]enderness along sacral area" and "uneven shoulder lie" with her "left

shoulder held higher than [her] right." *Id.* She was "unable to directly stand from seated

position." *Id.* "[S]tanding require[d] twisting her hips and back to unlock vertebral joints and

angulate lower back muscles to bypass stiffness and resulting in standing position." *Id.* Dr.

Winslow's impression was that Julie had "spinal stenosis with lumbar disc deg[ener]ation and

radiculopathy." R. 737. She refilled Julie's gabapentin and planned to refer her to aquatic

physical therapy. *Id.*

Julie saw Amanda Fleming, P.T., for aquatic physical therapy from August to October

2021. R. 906–09, 921–26, 929–934, 936–37, 940–45, 948–53. Julie reported difficulties with

walking and "daily activities." R. 906. She had muscle weakness and neck, back, and hip pain.

*Id.* At some appointments, she reported high levels of pain, R. 921, 929, 933, 940, 944, 948,

while at others she reported low levels of pain, R. 923, 931, 936, or no pain, R. 906, 925, 950.

She reported that "prolonged sitting" worsened the pain while "rest, cannabis, and stretching"

improved it. R. 906. Her "[t]ime while sitting" was "always shifting." *Id.* She reported that she

"ha[d] to sit to shower." *Id.* In her cervical spine, flexion and left side bending were "limited by

50%," rotation was "limited by 90%" bilaterally, and she was unable to extend or do right side

bending. R. 907. She had "[s]ingle [m]ovements [p]ain" with flexion, left side bending, and right

rotation. *Id.* In her lumbar spine, flexion was "limited by 50%," side bending was "limited by

80%" bilaterally, and she was unable to extend or do rotation bilaterally. R. 907–08. She had

14

"[s]ingle [m]ovements [p]ain" with flexion, bilateral side bending, extension, and bilateral

rotation. *Id.* Her hip range of motion was "3+ ([f]air [p]lus)" for flexion and "4- ([g]ood

[m]inus)" for extension, abduction, and adduction. R. 908. During "30 second chair stand[s],"

she was "slow to rise," used her upper extremities, and would "shift left then right at hips then

fully extend hips" to stand. *Id.* Ms. Fleming assessed Julie with impairments related to

"endurance, gait, muscle strength, pain, [and] poor body mechanics and posture" and functional

limitations of "impaired gait, limitations in home management, [and] performance in leisure

activities and" self-care activities of daily living. R. 909. By her final appointment, Julie

"reported that she ha[d]n't had any more symptoms since [her] last visit and that it was likely her

medication." R. 950. She "showed improvement with her power by increasing repetitions and

speed of exercises, balance by being able to perform 50% of exercises without the use of the rail

for balance[,] and strength as demonstrated by her ability to tolerate increased resistance" in the

pool. R. 952. However, she "continue[d] to have pain and limitations with activity tolerance on

land." *Id.*

On August 19, 2021, Julie saw Habibullah Ziayee, M.D. R. 983–84. On examination, she

had 5/5 strength throughout with "some limitation to" full range of motion in her lower

extremities "due to chronic back pain." R. 984. She had intact sensation to light touch

throughout, and there was "no evidence of extinction to bilateral stimuli." *Id.* On October 26,

examination findings were unchanged. R. 981–82.

    2.   *Medical Opinions*

On February 4, 2015, based on his mental status evaluation of Julie, Dr. Hill opined that

she "performed adequately on" mental status evaluation "items." R. 318. He also rated Julie's

degree of limitation performing specific work-related mental functions or activities. *See id.* Her

"[a]bility to perform simple and/or repetitive tasks" was "[m]ildly impaired." *Id.* Her abilities to

"perform complex tasks," "perform consistently," and "manage routine stressors were

"[m]oderately impaired." *Id.* Her abilities to "attend work regularly"; "interact with supervisors,

co-workers, and the public"; and "perform without interruptions from symptoms" were markedly

impaired. *Id.* Her prognosis was "[f]air with psychotherapy/psychiatry." *Id.*

On August 30, 2020, based on his examination of Julie, Dr. Wilson opined that she

"c[ould] be expected to sit and stand normally in an 8-hour workday with normal breaks." R.

547. She could walk for two hours at a time before needing a break and walk for six to seven

hours total in an eight-hour workday. *Id.* She did not require an assistive device. *Id.* She could

carry ten pounds frequently and fifteen pounds occasionally, could occasionally perform postural

maneuvers, and had no manipulative limitations. *Id.*

Bert Spetzler, M.D., reviewed Julie's medical records to determine the nature, severity,

and functionally limiting effects of her physical MDIs for DDS's initial review in October 2020.

*See* R. 105, 108–09. He found that Julie's lumbar degenerative disc disease and obesity were

severe MDIs. R. 105, 109. Dr. Spetzler opined that Julie could lift and carry twenty pounds

occasionally and ten pounds frequently, stand and/or walk for six hours in an eight-hour

workday, and sit for six hours in an eight-hour workday. R. 108. Her abilities to climb ramps or

stairs, push and/or pull, and balance were unlimited. *Id.* She could occasionally climb ladders,

ropes, or scaffolds; stoop; kneel; crouch; and crawl. R. 108–09. Dr. Spetzler attributed these

limitations to Julie's lower-back pain and obesity. R. 109. On reconsideration review in June

2021, Dr. Spetzler opined that Julie could only occasionally climb ramps or stairs and frequently

balance, but his opinion was otherwise unchanged. R. 119–20. He did not explain why he added

those postural limitations. *See* R. 117, 119–20.

In September 2020, Howard Leizer, Ph.D., reviewed Julie's records to determine the nature, severity, and functionally limiting effects of her mental MDIs for DDS's initial review. R. 105–06. He opined that Julie had a non-severe mental MDI (depressive, bipolar, and related disorders) and mild limitation in concentrating, persisting, or maintaining pace. R. 105. He noted that although Julie initially felt "edgy," lost her temper, and had sleep problems and stress, she later had normal mental status examinations, Zoloft "ha[d] helped," and she was noted to be "feeling good" and "sleeping well." *Id.* He concluded that "based on current information, there [wa]s no evidence that [Julie] ha[d] functional limitations from" mental MDIs, but it was "[r]easonable to assume some mild limitation in" concentration, persistence, or maintaining pace "due to effects of pain." R. 106. On reconsideration review in June 2021, Dr. Leizer affirmed his initial determination, but found that Julie now had no limitations concentrating, persisting, or maintaining pace. R. 117–18.

3. *Julie's Statements*

On April 16, 2021, Julie completed an Adult Function Report. R. 282–90. She has "[p]ain with . . . sitting." R. 282. Her bipolar disorder and "anger issue keep [her] from wanting to be involved with the public." *Id.* Her "[s]ocial disorder" makes her "feel like everyone is talking about or plotting against [her]." *Id.* Some of her medications make her "hear voices." *Id.* She struggles to get along with others because they do not understand her medical issues. R. 286. She needs monthly reminders to pick up her medications. *Id.* She needs alarms on her phone to remind her to take her medications and shower. R. 284. She can pay attention for "5–10 min[ute]s." R. 287. When interacting with authority figures, she "keep[s] to [her]self [to] avoid confrontation." *Id.* She does not follow written instructions well and prefers verbal instructions, which she follows "better[,] but [they] need[] to be one[-]on[-]one." *Id.* She does not handle

17

stress or changes in routine well. R. 289. Her impairments affect her ability to sit, stand, walk, reach, handle, and perform postural maneuvers. R. 287. They also affect her memory and her abilities to complete tasks, concentrate, understand, and get along with others. *Id.*

Usually, Julie spends most of the day "in [a] recliner or bed." R. 283. She takes care of her teenage daughter by waking her up and "help[ing] with homework." *Id.* Julie takes care of her dog, but her daughter helps by "feed[ing]/water[ing]/tak[ing] out [the] dog." *Id.* Julie must sit to bathe. *Id.* She wears her hair in a "ponytail all [the] time" and washes it "maybe 3 or 4 times a month." *Id.* Julie "microwave[s] sandwiches" daily. R. 285. When asked whether she prepares her own meals, she responded "[y]es/no" and explained that her "daughter does a lot of things" while Julie "may direct her." *Id.* Julie does no household chores. *Id.* She goes outside "at least once a day" and travels by driving a car. R. 285. She cannot go out alone because she feels "trapped" and "like everyone is out to get [her]." R. 285–86. She shops by computer, and although she picks up her purchases, shop staff load them, and her daughter unloads them and puts them away. R. 285. She spends time with "one friend" in person and via text message "once a week or less," and they talk and watch movies or television. R. 286.

Julie testified at the administrative hearing on February 3, 2022. R. 46, 52–72. She has "daily" back pain that "can exceed a ten" on the pain scale. R. 55. She can stand for about five minutes and sit for "about ten [minutes] or less" before having to rest for "about ten [minutes] or less." R. 55. She can walk across an average sized room before she needs to stop. R. 56. She "always" has to sit in a rocking recliner "so that [she] can lean it forward . . . . to push up on the arms to get up out of the chair." *Id.* She has received "shots for the pain in [her] back" three times, but they do not "alleviate the discomfort or pain." R. 56–57.

Julie has had bipolar disorder and depression "[f]or over 15 years." R. 63. She has severe depressive episodes "12 to 15 days a month." *Id.* During these episodes, she shuts down, stays in her room, "do[es]n't talk to [any]body," and "do[es]n't want to exist to anybody" or have people "acknowledge[] that [she is] even there." *Id.* She has manic phases "at least twice a month" that have "lasted up to five days," during which her "mind races" and she is "[r]epetitive," "constantly checks the same thing," and cannot focus or concentrate. R. 64.

Julie has borderline personality disorder, which makes her "jump from" being "fine" to being a "hateful person." R. 64–65. In that state, she "do[es]n't understand" or "realiz[e] . . . the repercussions . . . of what" she says. R. 65. She has had altercations, "difficulties with" people outside of her family, and "yelling episodes." *Id.* She has "injured her hand by punching a tree" and "destroyed something or hurt [her]self" in frustration, but she does not "get that far with [her] anger" very frequently. R. 65–66.

Julie has anxiety and posttraumatic stress disorder. R. 66. She has monthly flashbacks that result in "visual panic [and] body tension" and has nearly monthly nightmares that "have woken her up in a panic." *Id.* Doctors' appointments and interacting with the public make her feel anxious. R. 66–67. She "tend[s] to have panic attacks in public" and "feel[s] that the people are plotting against [her] and . . . everyone's watching [and] judging [her]." R. 54; *see also* R. 67. She tries to avoid speaking with the public "as much as possible." R. 67. When someone speaks to her, she is "respectful and polite[,] . . . but [she] keep[s] [her] answers as short as possible." *Id.* She has memory issues. R. 68. When she reads, she "cannot recall . . . what [she] ha[s] read," and she "ha[s] to make a lot of notes for [her]self" to remember information for doctors' appointments and grocery shopping. *Id.* She can follow complex instructions if they are "wr[it]te[n] down so that [she] c[an] . . . refer to them." *Id.* Because of her medications, she has

"audible delusions" "24/7" that "sound like a low radio or . . . TV or someone talking" quietly. *Id.* She cannot make out what the voices say. *Id.*

Julie lives in a house with her father and teenage daughter. R. 52. Typically, Julie "wake[s] her daughter up and make[s] sure that she's . . . getting herself ready for school." R. 71. Then, Julie "takes [her] medications" and "lay[s] down until" they have "alleviated some of [her] pain." *Id.* "[F]or the most part," she is "in [her] recliner or . . . laying across [her] bed." *Id.* She spends "most of the day" "in a reclined position." R. 72. Her father "tends to himself," and her daughter "does 90% of everything else." R. 69. Julie puts laundry in the washer and takes it out of the dryer "from a seated position," but her daughter does "everything else," including bringing the laundry downstairs, taking it back upstairs, and putting it away. R. 70. Julie orders groceries online. *Id.* When she leaves the house, she "prefer[s] to" have someone come with her, and she "very, very rare[ly]" goes "out of the house by [her]self." *Id.*

   *4.      The VE's Testimony*

The VE testified that a person with Julie's vocational profile and RFC, *see* R. 17, 25, could perform sedentary jobs like document preparer, final assembler, and lens inserter, R. 73–74. Employers at these jobs "might allow maybe one absence per month," including "coming in late or leaving early," "but generally don't permit much more than that." R. 74. They "might allow maybe 10% of the day for [being] off task above and beyond normal lunch and breaks, but generally don't permit much more than that." *Id.*

**B.     *The ALJ's Decision***

ALJ Hammock analyzed Julie's RFC. R. 17–25. She summarized certain aspects of the record, including some of Julie's written statements and hearing testimony and some of the objective and other medical evidence in the record. R. 18–23. She found that Julie's MDIs

20

"could reasonably be expected to cause [her] alleged symptoms." R. 18. However, she found that Julie's "statements concerning the intensity, persistence, and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." *Id.* The ALJ's summary of the medical evidence starts with her conclusion that "the objective findings in this case fail[ed] to provide strong support for [Julie]'s allegations of disabling symptoms and limitations." *Id.* Then, after recounting the medical evidence of Julie's physical MDIs, the ALJ concluded that "[t]hese findings" supported her assessment of Julie's RFC "in that the combination of the claimant's impairments, with associated symptoms, limit[ed] [Julie] to a range of sedentary work." R. 20. The ALJ referenced degenerative changes in Julie's cervical and lumbar spine, symptoms of tenderness, and findings of positive straight leg raise test and decreased range of motion. *Id.* She did not cite any specific medical records that contained those findings. *See* R. 20–21. The ALJ rejected Julie's "allegations of greater difficulties sitting" because she "was observed to sit comfortably in treatment notes." R. 21. She did not cite any specific medical records to support this conclusion.

After discussing the medical evidence of Julie's bipolar disorder, R. 21–22, the ALJ found that "mental status findings of record [were] generally normal," R. 22. The ALJ found that Julie's assertions "of greater difficulties with her memory" were inconsistent because "her memory was generally intact throughout the records." R. 21–22 (citing R. 480, 538, 649). She reasoned that "[t]he evidence show[ed] that [Julie] was generally cognitively intact and interacted normally with medical professionals." *Id.* (citing R. 317, 480, 532, 590–94, 972–73). She found that Julie's "allegations of greater limitations with concentrating and focusing" were inconsistent because Julie "had normal attention and concentration in the treatment notes." *Id.* (citing R. 317, 480). She noted that "[w]hile there [wa]s evidence of mood lability, [Julie] had

normal mood and affect in the recent records." *Id.* (citing R. 558, 590–91, 594); *see also* R. 22
("[T]hese findings support the residual functional capacity in that [Julie's] bipolar disorder, with
associated symptoms, limits [her] to a range of sedentary work.").

The ALJ further reasoned that Julie's "activities of daily living d[id] not support her
allegations of disabling symptoms." R. 22. The ALJ noted that Julie "reported that she cleaned
occasionally, . . . . took care of her daughter, . . . had no difficulties with personal care, . . .
prepared her own meals, . . . washed laundry, . . . shopped in stores, . . . watched television[,] . . .
. and spent time with a friend." R. 22–23 (citing R. 266–67, 269, 283–86, 317). The ALJ
reasoned that "[s]ome of the physical and mental abilities and social interactions required . . . to
perform these activities [we]re the same as those necessary for obtaining and maintaining
employment." R. 23. Thus, Julie's "ability to participate in these activities [wa]s inconsistent
with [her] alleged symptoms and limiting effects." *Id.*

Then, ALJ Hammock evaluated the medical-opinion evidence in the record. R. 23–24.
She noted that Dr. Spetzler's opinions limited Julie to light work and occasional postural
maneuvers. R. 23 (citing R. 108–09, 119–20). She found these opinions were "partially
persuasive." *Id.* She noted that Dr. Spetzler was a DDS medical consultant who had "program
knowledge and provided a detailed rationale" for his opinions. *Id.* She reasoned that "there [wa]s
some consistency with the evidence existing at the time of these opinions," including "findings
[of] normal sensation, normal tone, and non-labored breathing." *Id.* (citing R. 538). However,
she found that other evidence, including "findings that [Julie had] tenderness along the sacral
area and walked with a mild limp," was "consistent with finding that [Julie] [wa]s limited to a
range of sedentary work." *Id.* (citing R. 918).

ALJ Hammock noted Dr. Leizer's opinion for DDS's initial review that Julie's mental impairments were non-severe and that she had a mild limitation in concentrating, persisting, or maintaining pace and no limitations in understanding, remembering, or applying information; interacting with others; and adapting or managing oneself. *Id.* (citing R. 105–06). The ALJ also noted his opinion for DDS's reconsideration review that Julie had no limitations in the broad areas and that her mental impairments were non-severe. *Id.* (citing R. 117–18). The ALJ found that these opinions were "partially persuasive." *Id.* As before, she noted that Dr. Leizer was a DDS medical consultant who had "program knowledge and provided a detailed rationale" for his opinions. *Id.* She reasoned that they were "generally consistent with the evidence existing at the time," including findings that Julie was alert and had normal appearance, behavior, and speech; pleasant and cooperative attitude; linear and logical thoughts; and appropriate mood. *Id.* (citing R. 591). She found that other evidence was "consistent with finding that [Julie]'s mental impairments are []severe," including "findings that [Julie] was anxious and had obsessive thoughts." *Id.* (citing R. 480); *see* R. 13, 15–16.

ALJ Hammock noted Dr. Wilson's opinion that Julie could "sit and stand normally in an eight-hour workday with normal breaks, walk for two hours at a time for a total of six or seven hours, carry 10 pounds frequently and 15 pounds occasionally," and occasionally perform postural maneuvers. R. 23–24 (citing R. 547). She found that this opinion was "partially persuasive." R. 24. She reasoned that the consultative examination findings "generally supported" this opinion. *Id.* She noted findings that Julie "was able to walk on heels and toes with mild difficulty" and had "mild tenderness to palpation of the neck, lower back, and bilateral hip"; "only mild difficulty in the ability to squat and rise"; "no joint swelling or deformity"; and "no difficulty getting up and down from the examination table." *Id.* (citing R. 542–47). She

reasoned that this opinion was "generally consistent with the other evidence of record," including findings that Julie had normal tone and sensation and "was in no acute distress." *Id.* (citing R. 662). The ALJ did not adopt the opinion "verbatim because it [wa]s based on only a snapshot of [Julie]'s functioning and [was] not entirely consistent with the other evidence." *Id.* Additionally, "other evidence of record is consistent with finding that [Julie] c[ould] lift and carry at the sedentary level of exertion." *Id.*

ALJ Hammock noted Dr. Hill's opinion that Julie was mildly impaired in her "ability to perform simple and/or repetitive tasks"; moderately impaired in her abilities to "perform complex tasks," "perform consistently," and "manage routine stressors"; and markedly impaired in her abilities to "perform without interruptions from symptoms," "attend work regularly," and "interact with supervisors, co-workers, and the public." *Id.* (citing R. 318). The ALJ found that this opinion had "limited persuasive value." *Id.* She noted Dr. Hill "had program knowledge" and personally examined Julie rather than simply reviewing her medical records. *Id.* She reasoned that his opinion was inconsistent "with the other, generally normal, mental status examinations of record," specifically Dr. Winfrey's findings on three occasions that Julie had normal behavior, speech, and appearance; logical, linear, and goal-directed thoughts; appropriate mood; and pleasant, polite, and cooperative attitude. *Id.* (citing R. 590, 969, 972). The ALJ further reasoned that the opinion was "based on a snapshot of the claimant's functioning for the claimant's prior application," *id.*, and it was "not supported by the consultative examination findings, including the ability to complete a three-stage command and adequate concentration," *id.* (citing R. 317).

C.      *Discussion*

24

Julie challenges ALJ Hammock's RFC determination on two grounds. Pl.'s Br. 12–20.
First, she argues that the ALJ improperly evaluated Dr. Hill's medical opinion. *Id.* at 12–18.
Specifically, she argues that the ALJ's supportability and consistency analyses are not supported
by substantial evidence because the ALJ cherrypicked facts supporting a nondisability finding
while ignoring evidence supporting a disability finding. *Id.* Second, she argues that the ALJ's
adverse credibility finding as to Julie's alleged "inability to sit for prolonged periods of time" is
not supported by substantial evidence. *Id.* at 18–20. She argues that the ALJ cherrypicked
evidence and did not build an accurate and logical bridge from that evidence to her conclusion.
*Id.* Both arguments are persuasive.

A claimant's RFC is her "maximum remaining ability to do sustained work activities in
an ordinary work setting" for eight hours a day, five days a week despite her medical
impairments and symptoms. SSR 96-8p, 1996 WL 374194, at *2 (July 2, 1996) (emphasis
omitted). It is a factual finding that the ALJ makes "based on all the relevant evidence in the case
record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it
should reflect specific, credibly established "restrictions caused by medical impairments and
their related symptoms" that affect the claimant's "capacity to do work-related physical and
mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*,
780 F.3d 632, 637–40 (4th Cir. 2015). Generally, a reviewing court will affirm the ALJ's RFC
findings when it is clear that she considered all the relevant evidence under the correct legal
standards, *see Brown v. Comm'r of Soc. Sec. Admin.,* 873 F.3d 251, 268–72 (4th Cir. 2017), and
her written decision builds an "accurate and logical bridge from that evidence to his conclusion,"
*Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (cleaned up), *superseded on other grounds
as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023).

25

1.    *Dr. Hill's Medical Opinion*

"Medical opinions"—that is, "statement[s] from a medical source about what [the claimant] can still do despite" her MDIs and whether the claimant has "impairment-related limitations or restrictions" in meeting specific physical, mental, or environmental demands of work, 20 C.F.R. § 416.913(a)(2)—can be critical to a proper RFC analysis. *See, e.g.*, *Oakes v. Kijakazi*, 70 F.4th 207, 212–15 (4th Cir. 2023); *Woods*, 888 F.3d at 695. The regulations specify "how [ALJs] consider medical opinions" as part of their disability determinations and "how [ALJs] articulate" certain findings in their written decisions. 20 C.F.R. § 416.920c (claims filed on or after March 27, 2017). First, ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the claimant's record. *Id.* § 416.920c(a). Instead, ALJs "will consider [all] medical opinions . . . using the factors listed in [subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.*; *see Oakes*, 70 F.4th at 212. Second, ALJs "will articulate . . . how persuasive [they] find all of the medical opinions" in the claimant's record. 20 C.F.R. § 416.920c(b). These "articulation requirements" in turn instruct ALJs to "articulate how [they] considered the medical opinions from [each] medical source" on a source-by-source basis. *Id.* § 416.920c(b)(1). They "are not required to articulate how [they] considered each medical opinion . . . from one medical source individually." *Id.* ALJs should "articulate how [they] considered the medical opinions . . . from [each] medical source together in a single analysis using the factors listed in [subparagraphs] (c)(1) through (c)(5) . . . , as appropriate." *Id.* These "persuasiveness" factors include: "(1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other factors, like the physician's familiarity with the evidentiary record" and the standard for

determining disability. *See Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(c)(1)–(5)); 20 C.F.R. § 416.920c(c)(1)–(5).

The first two factors—supportability and consistency—"are the most important factors [ALJs] consider when [they] determine how persuasive [they] find a source's medical opinions . . . to be. Therefore, [ALJs] will explain how [they] considered the supportability and consistency factors for [each] medical source's medical opinions." 20 C.F.R. § 416.920c(b)(2). Supportability and consistency are distinct legal concepts under the regulations. *Id.* § 416.920c(b)(2)–(c)(2); *Oakes*, 70 F.4th at 212. "Supportability" requires ALJs to consider "the objective medical evidence and . . . explanations *presented by* [the] medical source . . . to support his or her [own] medical opinion(s)." 20 C.F.R. § 416.920c(c)(1) (emphasis added). *See Oakes*, 70 F.4th at 212. "Consistency" requires ALJs to compare that source's medical opinions to "evidence *from other* medical and nonmedical sources" in the claimant's record. 20 C.F.R. § 416.920c(c)(2) (emphasis added). *See Oakes*, 70 F.4th at 212. Thus, ALJs must explain how they considered *both* supportability *and* consistency for each source's medical opinion. 20 C.F.R. § 416.920c(b)(2). They "may, but are not required to, explain how [they] considered the [other] factors" in determining how persuasive the source's medical opinions are to the disability determination. *Id.*

As always, the ALJ's decision must build an accurate and "logical bridge between the evidence and the ALJ's conclusion that [a medical] opinion," *Oakes*, 70 F.4th at 214, is or is not "persuasive" evidence of the claimant's allegedly disabling medical condition, *see id.* at 212–13. When the court is "'left to guess' as to how the ALJ reached her evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of her conclusions," *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (per curiam)

(quoting *Mascio*, 780 F.3d at 638), to ensure that "the ALJ's decision is supported as a matter of

fact and law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) (per curiam).

ALJ Hammock's analysis of Dr. Hill's medical opinion does not satisfy "this deferential

standard" of review. *Arakas v. Comm'r of Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020). On

the consistency factor, "[t]he more consistent a medical opinion[] . . . is with the evidence from

other medical sources and nonmedical sources in the claim, the more persuasive the medical

opinion[] . . . will be." 20 C.F.R. § 416.920c(c)(2). Dr. Hill opined that Julie was mildly impaired

in performing simple and/or repetitive tasks; moderately impaired in performing complex tasks,

performing consistently, and managing routine stressors; and markedly impaired in performing

without interruptions from symptoms, attending work regularly, and interacting with supervisors,

co-workers, and the public. R. 318. The ALJ found that Dr. Hill's opinion was "not consistent

with the other, generally normal, mental status examinations of record," more specifically Dr.

Winfrey's findings that Julie had normal speech, behavior, and appearance; pleasant, polite, and

cooperative attitude; appropriate mood; and logical, linear, and goal-directed thoughts. R. 24

(citing R. 590, 969, 972). The ALJ merely listed examination findings from three of Julie's

appointments with Dr. Winfrey and did not explain how this evidence or any other relevant

record evidence was "not consistent with" Dr. Hill's opinion. *See* R. 24. For example, the ALJ

did not explain how any of Dr. Winfrey's observations related to Julie's abilities to interact with

supervisors or co-workers, attend work regularly, or perform work tasks without interruptions

from symptoms. *See id.* This lack of explanation leaves the Court to guess how the ALJ

concluded that Dr. Hill's opinion was of limited persuasive value to her disability determination.

*See Testamark*, 736 F. App'x at 398.

Moreover, the ALJ did not analyze Dr. Winfrey's other findings that are not necessarily inconsistent with Dr. Hill's opinion. *See* 20 C.F.R. § 416.920c(c)(2). During these same appointments, Dr. Winfrey noted that Julie was having "anger outbursts." R. 969, 972. This evidence of "anger outbursts" is at least partially consistent with Dr. Hill's finding that Julie was markedly impaired in interacting with supervisors, co-workers, and the public, *cf. Trina L. v. Kijakazi*, No. 22-1032, 2023 WL 3340439, at *5 (D. Md. May 10, 2023) (finding that substantial evidence supported RFC limitations to "no interaction with the public and occasional interaction with supervisors and co-workers" based in part on evidence of claimant's "irritability" and "anger outbursts"), and that Julie's symptoms would interrupt her consistent performance of work tasks. Furthermore, the ALJ did not discuss other conflicting evidence from the record, *see* R. 24, including PHQ-9 results indicating severe depression, R. 497–99, 507, and examination findings that Julie was anxious and had obsessive thoughts, R. 480, and inappropriate, depressed mood and affect, R. 511. As such, the ALJ did not meet her "obligation to consider all relevant medical evidence" and instead "simply cherrypick[ed] facts that support[ed] a finding of nondisability while ignoring evidence that point[ed] to a disability finding." *Lewis*, 858 F.3d at 869.

The supportability factor examines the "objective medical evidence and supporting explanations presented by a medical source . . . to support his or her [own] medical opinion[]." 20 C.F.R. § 416.920c(c)(1). The "more relevant" the evidence and explanations a medical source presents "to support his or her medical opinion[]" are, "the more persuasive" that opinion will be. *See id.* ALJ Hammock mentioned this factor, stating that Dr. Hill's opinion was "not supported by the consultative examination findings, including the ability to complete a three-stage command and adequate concentration." R. 24 (citing R. 317). The ALJ did not explain how

29

those two findings undermined Dr. Hill's opinion, *see id.*, again leaving the Court to guess how

she evaluated Dr. Hill's opinion. *See Testamark*, 736 F. App'x at 398. Moreover, she omitted

other, abnormal findings from the consultative examination, *see id.*, including that Julie "seemed

to misunderstand serial sevens" and had "angry/depressed" mood; depressed affect; 2/3 delayed

recall; and poor "[s]ymbol copy," R. 317. Although the ALJ acknowledged the abnormal

findings in her recitation of the medical evidence, R. 21, she did not discuss this mixed evidence

when assessing the supportability of Dr. Hill's opinion. *See* R. 24. Because she discussed only

"facts that support a finding of nondisability while ignoring evidence that pointed to a disability

finding" when assessing Dr. Hill's opinion, the ALJ's analysis was insufficient. *See Lewis*, 858

F.3d at 869–70.

ALJ Hammock did not explain how Dr. Hill's opinion was inconsistent or unsupported

and cherrypicked the evidence she listed, leaving the Court unable to review whether her

conclusions are supported by substantial evidence. *See Testamark*, 736 F. App'x at 398; *Lewis*,

858 F.3d at 869–70. These errors are especially problematic because the "moderate" to "marked"

limitations that Dr. Hill assessed conflict with aspects of the ALJ's RFC finding and, if credited,

would likely result in a determination that Julie was disabled. Dr. Hill's opinion that Julie was

markedly impaired in interacting with supervisors, co-workers, and the public, R. 318, conflicts

with the ALJ's finding that she could "have frequent interaction with supervisors and co-workers

[and] occasional superficial interaction with the public," R. 17. *See Trina L.*, 2023 WL 3340439,

at *5.[4] Relying on the VE's testimony, the ALJ found that Julie was not disabled because her

---

[4] The Commissioner argues that Dr. Hill's opinion was "of little probative value regarding [Julie]'s functioning during the relevant period" because it preceded the relevant period by five years and did not account for more recent, and possibly more relevant, medical evidence. *See* Comm'r's Br. 13–18, ECF No. 17. The Court declines to evaluate this argument as it rests on grounds upon which the ALJ did not rely, *see* R. 24. *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons [s]he gave.").

RFC and vocational profile, R. 17, 25, allowed her to do sample jobs that existed in the national

economy. *See* R. 25 (citing R. 73–74). The VE also testified that employers at these sample jobs

"might allow maybe one absence per month" and "maybe 10% of the day for off task above and

beyond normal lunch and breaks, but generally don't permit much more than that." R. 74. Dr.

Hill's opinion that Julie was moderately impaired in performing consistently and markedly

impaired performing without interruptions from symptoms and attending work regularly, R. 318,

indicates that she could not sustain substantial activities within those attendance and off-task

tolerances. Thus, remand is required.

### 2.    Credibility

The regulations set out a two-step process for evaluating claimants' symptoms. *Lewis*,

858 F.3d at 865–66; 20 C.F.R. § 416.929. "First, the ALJ looks for objective medical evidence

showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at

866, "in the amount and degree" the claimant alleges, *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir.

1996). *See* 20 C.F.R. § 416.929(b). Second, assuming the claimant clears the first step, "the ALJ

must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit the claimant's ability to do basic work activities." *Lewis*,

858 F.3d at 866. "The second [step] requires the ALJ to assess the credibility of the claimant's

[subjective] statements about symptoms and their functional effects," *id.*, after considering all

relevant evidence in the record, 20 C.F.R. § 416.929(c). The ALJ's credibility analysis can be

critical to a proper RFC determination. *See Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565.

An ALJ evaluating a claimant's RFC has broad discretion to decide whether an alleged

symptom or limitation is supported by or consistent with other relevant evidence in a claimant's

record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at

*5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Nevertheless, the ALJ must give specific reasons, supported by "references to the evidence," for

the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL

5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July

2, 1996)). A reviewing court will uphold the ALJ's credibility determination if her articulated

rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v.*

*Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v.*

*NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)); *Hines*, 453 F.3d at 565–66.

Julie argues that ALJ Hammock cherrypicked evidence and did not "adequately explain

the basis for her conclusion[]" that Julie's allegations about her inability to sit for prolonged

periods were inconsistent with record evidence. R. 18–20. Julie alleges that because of her back

pain, she cannot sit for extended periods. R. 54–57, 282, 287. She testified that she spends "most

of the day" "in a reclined position," R. 72, and can sit for "about ten [minutes] or less" before

needing to rest for "about ten [minutes] or less," R. 55. ALJ Hammock found that Julie's MDIs

could reasonably be expected to cause her alleged symptoms, including an inability to sit for

prolonged periods. *See* R. 18. However, the ALJ found that Julie's "statements concerning the

intensity, persistence, and limiting effects of these symptoms [we]re not entirely consistent with

the medical evidence and other evidence in the record." *Id.* The ALJ determined that Julie could

perform sedentary work, R. 17, which requires an ability to sit for at least six hours in an eight-

hour day, *see supra* n. 2.

When making a credibility determination, an ALJ must consider all the evidence in the

record, *Craig*, 76 F.3d at 595 (citing 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)), and build an

"accurate and logical bridge from the evidence to h[er] conclusion that the claimant's testimony

was not credible," *Brown*, 873 F.3d at 269 (cleaned up). ALJ Hammock did not build such a bridge. She reasoned that "[d]espite allegations of greater difficulties sitting, [Julie] was observed to sit comfortably in treatment notes." R. 21. It is unclear to which treatment notes the ALJ was referring because she gave no citation. In fact, no observations of Julie sitting comfortably exist in the record. This reason for the ALJ's adverse credibility determination is not supported by "references to the evidence" as required. *See Edwards*, 2013 WL 5720337, at *6.

The ALJ mentioned only one piece of evidence purportedly related to Julie's ability to sit and referred to it only in her summary of some of the objective medical evidence. *See* R. 18–21. There, she accurately described one examination finding that Julie had "no difficulty getting up and down from the examination table." R. 20 (citing R. 545). Even if the ALJ was referring to this finding in her credibility analysis, she mischaracterized it. A finding that Julie had "no difficulty getting up and down from the examination table," R. 545, is not an observation that Julie "s[a]t comfortably," R. 21. Furthermore, assuming that sort of evidence has some bearing on Julie's ability to sit for extended periods, other evidence suggested that Julie had difficulties sitting. During various examinations, Julie's pain increased during and worsened after a seated physical therapy exercise, R. 386; she was "in distress with sit to stand from chair," R. 475; and she struggled to stand from a seated position, contorting herself and using her upper body to rise, *see, e.g.*, R. 741, 908. The ALJ neither explained how any evidence supported her conclusion regarding Julie's ability to sit nor distinguished the evidence that conflicted with her conclusion. *See* R. 17–25. In fact, the ALJ omitted these contrary findings from her analysis entirely, *see id.*, even though she "has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869. Absent a fulsome discussion of the conflicting

medical evidence, some of which supports Julie's allegations regarding her difficulties with sitting, the Court cannot find that the ALJ built an accurate and logical bridge from the medical evidence she cited to her conclusion. *Brown*, 873 F.3d at 269.

ALJ Hammock also found that Julie's "activities of daily living," including cleaning occasionally, taking care of her daughter, having no difficulties with personal care, preparing her own meals, washing laundry, shopping in stores, watching television, and spending time with a friend, did not "support [Julie's] allegations of disabling symptoms." R. 22–23 (citing R. 266–67, 269, 283–86, 317). The ALJ reasoned that "[s]ome of the physical and mental abilities and social interactions required . . . to perform these activities [we]re the same as those necessary for obtaining and maintaining employment." R. 23. Thus, Julie's "ability to participate in these activities [wa]s inconsistent with [her] alleged symptoms and limiting effects." *Id.* However, the ALJ did not explain which abilities required to perform these activities were "the same as those necessary for obtaining and maintaining employment." *See* R. 22–23; *cf.* 20 C.F.R. § 416.972(c) ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, . . . club activities, or social programs to be substantial gainful activity."). She did not explain how the ability to engage in those activities conflicted with Julie's statements about her symptoms generally and their limiting effects, let alone her statements specifically about her ability to sit. *See* R. 22–23.

ALJ Hammock also "improperly disregarded [Julie's] qualifying statements regarding the limited extent to which she could perform daily activities." *Arakas*, 983 F.3d at 99. "An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Id.* ALJ Hammock "did not mention or address [Julie's] testimony," *id.* at 100, that she spends "most of the day" "in a reclined position," R. 72; *see also*

34

R. 283; washes her hair "maybe 3 or 4 times a month," R. 283; shops by preordering items online, R. 70; *see also* R. 285, which store staff load and her daughter "unloads and puts away," R. 285; and spends time with "one friend" by text or in person "once a week or less," "[t]alk[ing] [and] watch[ing] movies/TV." R. 286. Although Julie "microwave[s] sandwiches" daily, when asked whether she prepares her own meals, she responded "[y]es/no" and explained that her "daughter does a lot of things" while Julie "may direct her." R. 284. Although Julie "physically puts [laundry] in the washer and then the dryer from a seated position," her daughter does "everything else" for the laundry. R. 70. Because Julie's daily activities either do not require sitting or require sitting for only short periods, they do not indicate that she can sit for extended periods. Therefore, "[s]ubstantial evidence does not support the ALJ's conclusion that [Julie]'s subjective complaints were inconsistent with her daily activities[] because the record, when read as a whole, reveals no inconsistency between the two." *Arakas*, 983 F.3d at 100 (cleaned up). "The ALJ selectively cited evidence concerning tasks which [Julie] was capable of performing." *Hines*, 453 F.3d at 565. "Thus, [s]he failed to build an accurate and logical bridge from the evidence to h[er] conclusion." *Arakas*, 983 F.3d at 100 (cleaned up). Accordingly, the Court finds that none of the reasons the ALJ provided for her adverse credibility determination as to Julie's alleged inability to sit for prolonged periods are supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's motion for summary judgment, ECF No. 16, **REVERSE** the Commissioner's final decision denying Julie's SSI claim, and **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g).

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

ENTER: March 1, 2024

Joel C. Hoppe
United States Magistrate Judge

36